**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-735 (RCL)** |
| **JAMES ROBERT ELLIOTT,**<br>**a/k/a "Jim Bob,"** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant James Robert Elliott to a midpoint sentence of 41 months' imprisonment, three years' supervised release, $2,000 restitution, and the mandatory $100 special assessment.

## I.    INTRODUCTION

On January 6, 2021, Elliott, a tow-truck driver, seemed to view himself as the star of a war movie. He got up that morning and met with an associate, who delivered body armor Elliott had purchased. He dressed all in black, including silver-spiked hard-knuckle gloves. When he arrived at the Capitol, he put on goggles and a ballistic helmet. He carried an American flag attached to a wooden pole inscribed with the Greek phrase "Molon Labe" – "come and take them," an expression of defiance.

It was not just a costume. Elliott advanced over fallen barricades to the Lower West Terrace, where rioters savagely attacked police, many using makeshift weapons, and police used

1

less-than-lethal munitions to send a clear signal to the rioters to go home. Elliott did the opposite. Over and over again, he foisted his flagpole in the air, yelling "Patriots, what is your occupation!," quoting the movie *300,* which dramatizes the battle between the Spartans and the Persians at Thermopylae in 480 B.C. He followed with a guttural war cry taken from the movie: "AAH-OOH, AAH-OOH, AAH-OOH," thrusting his flagpole with each grunt for emphasis, urging his fellow rioters forward to do battle with the outnumbered police.[1]

And Elliott did not just instigate – he joined the battle himself. When the police and rioters engaged in a tug-o-war over a bicycle rack, Elliott swung his flagpole at the head of U.S. Capitol Police Officer J.W., hitting him. He followed up by thrusting the flagpole at J.W.'s face.

After January 6, Elliott acknowledged over text that he had "bonked two cops." He made light of this startling disclosure, following up with "lol" (laughing out loud). His actions on January 6 caught his fellow Proud Boys' attention, and he found himself nominated for the highest degree of membership in the organization.

The government recommends that the Court sentence Elliott to 41 months' incarceration for violating 18 U.S.C. § 111(a)(1), which is at the midpoint of the Guidelines' range of 37-46 months, as found by Probation and as to which the parties stipulated in their plea agreement. A 41-month sentence reflects the gravity of Elliott's conduct as both an agitator and a violent actor, accounts for his lack of criminal history, and credits that he eventually accepted responsibility by pleading guilty.

---

[1] Although Elliott saw himself as an heir to the 300 Spartans who were vastly outnumbered by their foes at the Battle of Thermopylae, he was part of a mob of rioters who vastly outnumbered the police officers guarding the Capitol Building on January 6.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 27, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Elliott's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

On January 5, 2021, Elliott, a member of the Northern Illinois Proud Boys, drove with his father and brother from Illinois to Washington, D.C. The morning of January 6, he met an individual who delivered the body armor (a vest with steel plates designed to withstand rifle-caliber bullets) that Elliott had purchased. Elliott put on the ballistic vest, attached a Baofeng (handheld two-way) radio to his shoulder, and met with other members of the Proud Boys at the Washington Monument. He carried a backpack with a helmet strapped to it. He had previously spread the word among other Proud Boys via text message that the Washington Monument was their meeting point, with a march starting from there.[2]   Elliott wore all black, rather than the Proud Boys' signature black and yellow colors, including black hard-knuckle gloves reinforced with spikes. This was consistent with messages circulated among Proud Boys' leadership, which had instructed the group to meet at the Washington Monument that morning and not wear "colors." He

---

[2] The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world, aka Western Chauvinists."

3

also carried a wooden flagpole with an American flag. The pole was inscribed with "We the People" and the Greek phrase "molon labe," or "come and take them," which has been mythologized as what the Spartan leader, King Leonidas, yelled to the Persian King Xerxes when King Xerxes demanded that the Spartans drop their weapons. In the war movie *300,* which portrays the Spartans' battle against the Persians, the King Leonidas character yells a similar phrase during one battle scene:[3]



*Figure 1: Still from the war film* 300

At the Washington Monument gathering, Elliott expressed his belief that the election had been stolen. He and the other Proud Boys then marched together to the Capitol.

### ***Elliott Enters Capitol Grounds and Prepares to Do Battle***

Elliott approached the Capitol from the west, crossing over clearly toppled barriers as he arrived at the West Plaza.

---

[3] https://www.youtube.com/watch?v=jpUVQ_z6Zcs (last visited March 15, 2023).



*Figure 2: Elliott crosses one layer of barricades*

Ahead of him, on the Lower West Terrace, rioters had begun fighting the vastly outnumbered police, who sought to defend the inaugural stage and the stairs that led to entrances to the Capitol Building. Elliott crossed another barrier, a black metal fence. Near a downed section of that fence, he turned around to face the growing throng behind him and, thrusting his fist in the air, led chants of "Whose House?   Our house!"

And then, he prepared for battle. He put on his goggles and ballistic helmet.



*Figure 3: Elliott wearing ballistic helmet and goggles*

He advanced to the front lines of the battle and urged others to join him, turning toward the

5

crowd and invoking *300* again. He held his flag aloft like a spear, and yelled, paraphrasing Leonidas, "Patriots! What is your occupation?" before thrusting his flag/spear in the air three times as he shouted, as the Spartans did in the movie, "AAH-OOH!   AAH-OOH!   AAH-OOH!"



*Figure 4: Still from* 300

Elliott was already known among his local Proud Boys chapter for the use of this phrase. His grunting cries were so notable that even one observer standing far back from him on the front lines noted them – and it was far from quiet at the time.

Elliott's warlike maneuvers continued. When the police used less-than-lethal munitions to try to clear the area, he held up his arms and motioned rioters forward, as seen on video (Exhibit 1), a still frame from which is below:



*Figure 5: Still frame from Exhibit 1 showing Elliott motioning rioters forward*

He inquired after the well-being of other rioters close to the line and urged those who appeared vulnerable to leave the area, like a soldier checking on the wounded. And over and over, he turned to the crowd and yelled his war cry: "Patriots, what is your occupation!   AAH-OOH! AAH-OOH!   AAH-OOH!"

At approximately 1:30 p.m., a group of rioters next to Elliott worked together to push against a group of officers on the northern part of the Lower West Terrace, the most vulnerable area of the police line.



*Figure 6: Still from U.S. Capitol Police CCTV showing the West Plaza*

7

*See* Exhibit 2 (open-source video) at 0:06-0:15. A Metropolitan Police Department lieutenant sprayed the rioters with O.C. spray to try to clear the area. *Id.* at 0:15-0:30. Elliott's response was to turn the to the crowd and yell his war cry, communicating that he was not willing to give up and obey police commands—and they should not either. *Id.* at 0:42-0:54; 0:57-1:02; 1:09-1:15; 2:03-2:18; 2:56-3:00. Rioters soon returned to the area and began battling police again. Below are screenshots from a clip of an open-source video, Exhibit 2, that captures these events:





*Figure 7: stills from Exhibit 2 showing Elliott yelling war cry*

*Elliott's Assault*

Shortly before 1:40 p.m., rioters tried to drag away a bicycle rack that officers were using as a police line. The officers pulled back, and a tug-o-war began. Elliott, who was near the bicycle rack, swung his flagpole at the officers' heads, striking U.S. Capitol Police Officer J.W. He then straightened the pole and thrust it forward across the police line again. Below is a sequence of images from an open-source video showing Elliott's flagpole swinging at the officer:





*Figure 8: Stills showing flagpole swinging at Officer J.W.*

Officer J.W., 24 years old at the time, had just gotten his protective hard-gear suit a week or two before January 6. That day, he, along with approximately 20-25 other officers, reported to the Lower West Terrace after hearing over the radio that officers had been attacked at the Peace Circle—the first breach. Protected by little more than a line of bicycle racks, he faced a massive crowd of rioters. He recalled the rioters using weapons against the officers, some improvised – such as chemical irritant sprays, fire extinguishers, bicycle racks, wood planks – and flagpoles. A man paced across the police line, yelling death threats. Officer J.W. was hit multiple times in the head that day—not just by Elliott's flagpole, but also with a wooden plank, which caused him to briefly lose consciousness and bite his tongue. During one struggle over a bicycle rack, rioters pushed Officer J.W. to the ground. Rioters sprayed him multiple times with chemical irritants, and he felt the effects. He did not seek medical attention immediately after the January 6 attack but went to the hospital two days later, where he was diagnosed with a mild concussion.

Minutes after Elliott's assault, rioters broke through a police line that had been guarding a

10

set of scaffolding-covered stairs adjacent to the Lower West Terrace, which led to the Upper West

Terrace. Rioters on this path would be the first to breach the Capitol Building, about 30 minutes

later. Elliott moved to the scaffolding. In front of it, he turned around, and again urged the other

rioters forward, yelling the *300* war cry and lifting his flag in the air again.



*Figure 9: Elliott urging rioters forward at the scaffolding*

Beneath the scaffolding, however, Elliott encountered tear gas. He retreated to recover from its

affects and, to the government's knowledge, did not advance further.

### Elliott's Communications Following the Breach

The evening of January 6, Elliott filmed angry Telegram videos expressing anger with

Donald Trump for denouncing the riot and conceding the election. Elliott characterized his and

other rioters' efforts as "taking" the Capitol. Exhibit 3 is one such video. In Exhibit 3, Elliott says,

"Trump just said…that the people in D.C. don't represent America. We fucking took the Capitol Building for this motherfucker, and he has the gall to say that we don't represent America." He continued, "And then the motherfucker bends over and lets Biden stick his fucking shoes in his ass and kicks him out of the fucking White House. Whatever happened to 'you refuse to concede no matter the results?'"   He exclaimed, "We fucking fought for him, we took the fucking Capitol for him, and then he fucking concedes to Biden!" In another video, Elliott acknowledged he had been in a "dangerous situation" and "could have died," rattling off a list of his associates who had also been there.

The next day, Elliott began to brag about his actions over text message, making light of the violence with the occasional "Lol" (laughing out loud). He sent one contact the image in Figure 9 above, and said, "We took the fucking capital lol." The contact responded, "Did you go inside???" Elliott wrote, "No but I was one of the first 50 to the scaffold." His contact said he was a "real American hero." Elliott responded to this encouragement with a longer, self-serving account, portraying himself as a soldier tending to the wounded: "Dude I was one of the first 50 into the scaffolding I got to the top of the stairs then I stayed back to do what I came for which was help people I carried people back behind lines, washed eyes out from pepper spray, lead more people to safety. I got at least 4 times, tear gassed at least 5 times." He also described the accolades he was receiving from the Proud Boys: "PB is calling me lord Jimbob and shit, and I'm getting nominated for a 4th degree."[4]   He later confirmed his fourth-degree membership in a text: "Oh

---

[4] Membership rankings within the Proud Boys progress from first degree (the lowest level) to fourth (the highest).

dude the meet was last night I got my 4th." His contact replied, "Dude that 4th degree came quick."

Elliott next described his use of the war cry: "wan[n]a know what my rally cry was?!" His contact replied, "Yes," and he said, "PATRIOTS, WHAT IS YOUR PROFESSION!   AAHOO AAHOO AHHOO! the crowd chant that and push with me fucking incredible that's what I was yelling in that picture." His contact replied, "that's epic man," "Rlly is," and Elliott explained, "Its what the spartans used man I am honored to carry that torch lol." The next day, Elliott described himself in another text message as a "camera magnet." He said that the day "was a blast."

Elliott soon acknowledged the possibility that he could be arrested. He reported to one contact that "iv been keeping tabs on the fbi people of interest page and im not on there." He also implored one contact, "Please make sure you don't tell anyone please about what I told you about dc im not sure but Its possible I could get in alot of trouble lol." His contact responded, "No I absolutely understand," which apparently comforted Elliott sufficiently that he made an even clearer admission: "Oh dude wa[n]na know one more cool thing? I bonked 2 cops…never thought I'd say that lol."

He then provided details, including a second anecdote describing a pushing match over a bicycle rack:

> Ya one of them was trying to grab my buds girl and we ripped her away from them but they still had ahold of her American flag blanket so I grabbed it and he wouldn't let go so I bonked him with my flag pole lol. The next time the cops maced a guy and when I pulled him out the cops pushed a barrier on top of us when 2 guys pushed the barrier off of us I helped push it back bonked another cop, then I went back to helping to poor guy that almost got trampled.[5]

---

[5] Video of the assault to which Elliott pled guilty shows neither the police grabbing a woman's American flag-blanket nor the police pushing a barrier on top of rioters.

Elliott also took to Twitter to defend the participants in the Capitol breach, depicting himself and the rioters as victims: "We were shot at, tear gassed, flashbanged, peppersprayed." He celebrated the rioters' so-called achievements and taunted his perceived opponents: "Your just salty because blm and antifa have been rioting for almost 4 years and have only managed to get ther[e] as[s] kicked over and over again when in 6 fucking hours we took the fucking capital in 2 different states." In a post with more racial overtones, he wrote, "black people get shot for breathing? They have been burning and looting for years and we do it once and do it better and you lose your shit. What did we culturally appropriate rioting?"

In addition to keeping tabs on the FBI's investigation into January 6, evidence suggests that Elliott tried to throw off amateur sleuths who had begun gathering evidence against and identifying participants in the Capitol attack. These sleuths had already published pictures of Elliott online, identified by the hashtag "allblackbabythor." They had also published an online video where he introduced himself as "Jimbob from Aurora, Illinois" while on Capitol Grounds. Elliott told two leaders of the Northern Illinois Proud Boys that it had been a mistake to introduce himself by name and hometown.

As of at least June 2021, online sleuths had not yet identified Elliott by his true name, although they had placed him with members of the Proud Boys at a Schaumburg, Illinois rally, dressed in the Proud Boys' colors. On Elliott's phone, the FBI found screenshots of June 2021 posts from a Twitter account under the username "Janet Garry," with a profile picture of the rainbow-colored Progress Pride flag associated with the LGBTQ community. Elliott had the same image of Garry's profile picture (the Progress Pride flag) saved on his phone next to the post.

14

"Janet Garry" provided false information about "allblackbabythor," including (1) that he was from Schaumberg, Illinois (Elliott is from Aurora) and (2) that his name was "Sam." "Janet Garry" also invented a story that "Sam" used to date "Janet Garry's" partner "before she came out as lesbian." Below is an image of the "Janet Garry" posts found on Elliott's phone. FBI agents tried to obtain subscriber information for this account after Elliott's arrest, but the account had been deleted.



*Figure 10: Screenshot of "Janet Garry" Posts*

**Arrest, Interview, and Procedural History**

On December 15, 2021, a grand jury charged Elliott in a six-count indictment, including one count of violating 18 U.S.C. §§ 111(b) and 111(a)(1) for the assaulting an officer with his

flagpole (Count Two of the indictment).[6] ECF No. 1. FBI agents arrested Elliott at his workplace on December 20, 2021. After waiving his Miranda rights, Elliott spoke with the agents. He identified himself in photographs and videos from January 6. He claimed he could not recall the last names of his fellow Northern Illinois Proud Boys associates whom he had met in Washington, nor could he recall the name of the individual who had sold him the ballistic vest. He acknowledged that the leader of the Northern Illinois Proud Boys (whose last name he did not recall) had coordinated a meeting at the Washington Monument, declining to note that he had communicated this plan to others. He told the agents he did not plan for violence and thought the Proud Boys would be parading through Washington, D.C., led by Donald Trump. He explained that he had a ballistic vest, helmet, and hard-knuckle gloves in anticipation of resistance from Antifa or Black Lives Matter during the Trump-led parade.

Elliott explained that he had planned to return to his hotel after stopping at some food trucks with the Proud Boys but saw people heading toward the U.S. Capitol. Because he generally likes to know what is going on, he said, he made his way up to the police line. Later, he claimed that the purpose of going to the Capitol to ensure that everyone got to leave safely. He told the FBI agents that he had helped people get up when they fell, cleaned out their eyes, and moved them away from the police line. He said that he was "sucked into the scaffolding" and turned around once he saw violent people inside. He acknowledged saying, "Patriots, what is your occupation?" at the police line.

---

[6] While Elliott admitted over text message to using his flagpole against officers in two separate instances, the government was not in possession of his text messages at the time of indictment.

When confronted with images of his flagpole swinging across the police line, Elliott said he did not remember swinging it or thrusting it at officers. He suggested that it might have "lowered" as he picked someone up from the ground—although he said he could not recall this particular incident.

After the government provided a reverse proffer, in September, 2022, Elliott offered to meet with the government for a proffer. It soon became clear, though, that he was either unwilling or unable to offer much additional information.[7] On November 2, 2022, Elliott pled guilty to a felony violation of 18 U.S.C. § 111(a)(1), pursuant to a plea agreement.

## III.    STATUTORY PENALTIES

Elliott now faces sentencing for a violation of 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years' imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100. In the plea agreement, Elliott admitted that his assault involved physical contact with the victim, triggering the felony-level penalties for the violation. *See* 18 U.S.C. § 111(a)(2) (providing for a maximum sentence of eight years where the assault "involve[s] physical contact with the victim.")

---

[7] For example, in the days following January 6, Elliott sent a text saying that "J--" had gone inside the Capitol building and that he had a "funny story" to share about it. In discussions regarding the potential proffer, Elliott (through counsel) claimed that that he had no information on what "J---" did that day.

17

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties and probation agree that the following Guidelines calculation applies:

Count Two: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Use of Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **24** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **21** |

*See* Plea Agreement at ¶ 4(A).

The U.S. Probation Office calculated Elliott's criminal history as category I, which the government does not dispute. PSR ¶ 48. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 21, Elliott's Guidelines range is 37 to 46 months' imprisonment, as was estimated in the plea agreement.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

---

[8] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. Elliott's assault constituted an aggravated assault for two reasons: it involved (1) a dangerous weapon with intent to cause bodily injury, and (2) the intent to commit another felony (a violation of the civil disorder statute, 18 U.S.C. § 231(a)(3)).   U.S.S.G. §2A2.2 n.1.

18

**A.    Nature and Circumstances of the Offense**

Elliott assaulted a police officer with a heavy wooden flagpole in the midst of a violent riot. When Elliott swung his flagpole, the officer was struggling against several other rioters, fighting over the thin bicycle-rack barrier separating the police from thousands of agitated persons seeking to unlawfully enter the Capitol building. Chemical spray and projectiles rained down on the officers from the front and sides; from those on the front lines, and from those further back. Surrounded by agitators, it was impossible for officers to track all possible threats at once, making them even more vulnerable to quick attacks like Elliott's. Once Elliott swung at the officer, he did not stop there – he thrust his pole forward, toward the officer's face. Elliott admitted that this was only one of two times he "bonked" an officer that day. In addition, with his incessant battle cry, he acted as an instigator, urging fellow rioters forward, urging them to fight—even when every signal from the police told them to turn around and leave.

Elliott's was a serious crime, made even more serious by the context in which it occurred. Elliott's assaultive conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis. As Elliott's Telegram videos following the riot make clear, he engaged in violence that day for political ends, to keep his preferred candidate in power through violence if necessary.

Elliott subsequently claimed that his goal at the Capitol was to help people. Video evidence does suggest that, on at least one occasion, he checked on the well-being of a woman near the front lines. His charity, however, extended only to those on one side of the battle: his own. He repeatedly

urged his fellow rioters to advance toward police lines and later, to follow him and breach the scaffolding. He showed no sympathy for the officer he attacked with a flagpole. Instead, he focused his energy on individuals who had trespassed into a restricted area and made their way up to the police line. His efforts to render aid to other rioters in no way negates his assault on the police and his efforts to provoke others to do the same. Moreover, as an individual who sought repeatedly to encourage others to do battle—using a literal war cry—Elliott contributed to the situation that exposed his fellow rioters in danger in the first place. His suggestion that the police were the aggressors in the situation because they used less-than-lethal crowd control munitions after a crowd of thousands trampled over barriers, began savagely attacking them with items including wooden planks and fire extinguishers, and threatened to invade the Capitol while Congress and other civilians met inside, distorts the obvious reality. As Elliott himself recognized, he and the rioters were "taking the Capitol." One does not "take" a building in a defensive posture.

The nature and circumstances of Elliott's offense were of the utmost seriousness, and fully support the government's recommended sentence of 41 months.

**B.  The History and Characteristics of the Defendant**

Elliott is a 25-year-old father of two with no criminal history. He works as a tow-truck operator. He has represented that incarceration will create hardship for his young family.   It is regrettable that, despite having two small children, Elliott made a deliberate choice to travel to Washington for the events of January 6, enter a situation where he felt that he needed to wear a ballistic vest for protection, attack the police, attempt to inspire others with violent and angry rhetoric, and then joke and minimize in the days and months that followed.

Elliott has acknowledged his participation in previous rallies with the Proud Boys. While there is certainly nothing wrong with participating in a rally, the point is that Elliott was not a newcomer to political demonstrations and had shown himself capable of adhering to the law in those settings in the past. He was equally capable of recognizing that, when he entered the battle zone that was the West Front of the Capitol on January 6, he was contributing to the brutal violence of that day, and he was capable of recognizing that he was acting illegally.

The description of Elliott's Proud Boys affiliation in the PSR, provided by defense counsel, minimizes his role in the group and the group's actions on January 6. Elliott, through counsel, described himself as a "low level" member of the organization who obtained only second-degree membership (PSR ¶¶ 63-64)—and yet, he held an office in his chapter, and his own text messages note that he obtained the fourth-degree rank ("Oh dude the meet was last night I got my 4th ˸"). The description of the degrees of Proud Boys membership the defense provided to Probation (PSR ¶ 63) also omits any mention of fourth-degree membership, which, according to a recruiting manual, requires an aspiring member to engage "in a major conflict for the cause."[9]   The manual noted, "serious physical fights also count." *Id.*

Elliott and his fellow Proud Boys also coordinated their meeting place and attire that day and prepared for violence; Elliott went so far as to buy a bulletproof vest ahead of time. He also brought and wore a ballistic helmet, goggles, and hard-knuckle gloves. He claims that this was

---

[9]  Alan Feuer and Zach Montague, *Proud Boys' Views on Violence Take Center Stage at Jan. 6 Trial,* The New York Times, Jan. 25, 2023, *available at* *https://www.nytimes.com/2023/01/25/us/politics/proud-boys-violence-jan-6.html* (last visited March 16, 2023).

because he feared being attacked, but he did not wear clothing identifying himself as a Proud Boy that day, and most of the thousands of other individuals who attended the rally in support of President Trump did not find it necessary to outfit themselves similarly. Moreover, Elliott did not put on his goggles and helmet until after he entered the restricted area and joined the conflict with police—it was not purely defensive, and it was not in fact a response to Antifa.

In connection with his sentencing, Elliott wrote a letter to Probation, his first expression of remorse. But it is incomplete. Elliott's letter says, "If I hurt anyone, I sincerely apologize." PSR ¶ 34. Elliott pled guilty to assaulting an officer. He admitted over text message to assaulting another officer. He repeatedly urged rioters forward to the front lines to attack police. It is incomprehensible how he could even think that there is a question as to whether his actions "hurt anyone" that day. Nowhere in his letter does he acknowledge the injuries to officers, let alone the psychological distress and harm caused to both those defending the Capitol and those sheltering in place inside it.

While the government appreciates that Elliott is now apologizing for his actions, his initial communications indicate the opposite attitude. His incessant war cry that day was a call to violence. On the drive home from Washington, D.C., he berated President Trump for condemning the rioters. In text messages, he took a lighthearted attitude toward his assaultive behavior, punctuating his admission that he "bonked" police with an "lol." And in his interview with the FBI, he claimed not to remember swinging his flagpole at the police, while also offering an improbable excuse (that his flagpole simply "fell"). He continued to offer the excuse that he was there to help people—which, as explained above, is no excuse at all, and which fails to account for

22

his assaultive behavior and efforts to rile up the crowd to attack.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Elliott's criminal conduct, attacking officers who sought to defend Congress and urging others to do the same, was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration, for the reasons described in the discussion of Elliott's history and characteristics. Even Elliott's letter to probation minimized his conduct by failing to recognize the harms his actions caused. His text messages regarding those actions reflect a cavalier attitude toward the assaults he committed. Elliott's failure to fully accept responsibility and recognize the harm he caused is another data point suggesting some risk of reoffending.

---

[10]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

To date, the Court has sentenced approximately four defendants for violations of 18 U.S.C. § 111(a)(1) in connection with their actions on January 6. Each of these defendants has received a sentence within the Guidelines range; Elliott should receive a Guidelines sentence as well. *See United States v. Scott Fairlamb,* 21-cr-120 (RCL) (41-51 month Guidelines range, 41-month sentence); *United States v. Duke Wilson,* 21-cr-345 (RCL) (41-51 month Guidelines range, 51-month sentence); *United States v. Neefe and Smith,* 21-cr-567 (RCL) (41-51 month Guidelines

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

range; 41-month sentence for each defendant). While each of these other defendants, unlike Elliott, also pled guilty to violating 18 U.S.C. § 1512, Elliott's lower Guidelines range (37-46 months) already accounts for the fact that he has not also been convicted of obstruction of an official proceeding. Notably, in his Telegram video from the night of January 6, Elliott boasted that he "took the Capitol" for Trump, an admission that he stormed the Capitol to disrupt the peaceful transfer of power.

Comparing and contrasting the details of these cases further supports a Guidelines sentence. Unlike Elliott, Scott Fairlamb accepted responsibility very early for his actions, and was the first January 6 defendant to plead guilty to assaulting a federal officer. Fairlamb also offered an officer water and told others in the crowd to leave officers alone. Gov. Sent. Mem., *United States v. Wilson,* 21-cr-345 (RCL), ECF No. 29, at 27 (D.D.C. filed March 1, 2022). Elliott aided only his own side.

Duke Wilson was only the third defendant to plead guilty of assault; the government characterized his acceptance of responsibility as "remarkably early." *Id.* at 22. Like Elliott, he did not enter the Capitol. Moreover, and also unlike Elliott, neither Wilson nor Fairlamb was a member in the Proud Boys or other militia; none was an agitator the way Elliott, repeatedly yelling a battle cry, attempted to be; and neither was similarly outfitted for violence.

Like Fairlamb and Wilson, and unlike Elliott, Marshall Neefe also admitted guilt early. Gov. Sent. Mem., *United States v. Neefe,* 21-cr-567 (RCL), ECF No. 84 (D.D.C. filed Aug. 10, 2022). Neefe and Charles Smith's joint assault was unlike Elliott's: they were two members of a crowd that foisted a large Trump sign toward the police line. *Id.* at 11-12. They did not directly

strike an officer in the head, as Elliott did. Following his arrest, Neefe, like Elliott, gave an

interview—but unlike Elliott, who minimized his conduct and claimed not to remember key

events, Neefe admitted his assault and told the FBI that he believed that his actions on January 6

were wrong, expressing remorse. *Id.* at 18. Neefe's case does include certain aggravating factors

Elliott's does not; chiefly, that he entered the Capitol Building itself, and his rhetoric included

threats of future violence (although Elliott's post-January 6 statements are problematic, but for

other reasons). Neefe's codefendant, Smith, like Elliott, did not enter the Capitol. Gov. Sent. Mem,

*United States v. Smith,* 21-cr-567 (RCL), ECF No. 90, at 17 (D.D.C. filed Sept. 19, 2022). Smith,

like Elliott, also encouraged rioters to resist the police. *Id.* at 29. And Smith, like Elliott, minimized

or was not fully candid about certain aspects of his conduct with the FBI. *Id.* at 30. The government

acknowledges that Smith's online rhetoric was marginally more violent than Elliott's—although

Smith was not, to the government's knowledge, a member of the Proud Boys or a militia group.

*Id.* at 18-21. The government's 41-month recommendation here would not create an unwarranted

sentencing disparity when compared with other defendants this Court has sentenced for the same

crime.

## VI.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[13] *United States v. Papagno*, 639

---

[13] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C.

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. Elliott participated a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[14]

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Elliott must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Elliott played in the riot on January 6.[15] Plea Agreement at ¶ 11. Elliott's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

___

§ 3663A(c)(1).

[14] As of October 17, 2022, the approximate loss suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

29

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 41 months' imprisonment, three years' supervised release, $2,000 restitution, and the $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    _/s/ Alexis J. Loeb_____
ALEXIS J. LOEB
Assistant United States Attorney (Detailed)
U.S. Attorney's Office
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Office: (415) 436-7168
Alexis.Loeb@usdoj.gov